**[This opinion has been published in *Ohio Official Reports* at 72 Ohio St.3d 274.]**

TOLEDO BAR ASSOCIATION *v.* POMMERANZ.

[Cite as *Toledo Bar Assn. v. Pommeranz*, 1995-Ohio-109.]

*Attorneys at law—Misconduct—One-year suspension suspended on condition of completing one year of monitored probation—Engaging in conduct prejudicial to the administration of justice—Engaging in conduct that adversely reflects on fitness to practice law—Neglect of an entrusted legal matter—Failing to seek client's lawful objective—Failing to carry out contract for professional services.*

(No. 94-2666—Submitted February 7, 1995—Decided May 31, 1995.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 91-45.

—————————

{¶ 1} By amended complaint filed March 31, 1993, relator, Toledo Bar Association, charged respondent, Melvin P. Pommeranz of Toledo, Ohio, Attorney Registration No. 0031840, with seven counts of misconduct involving, inter alia, DR 1-102(A)(5) and (6) (engaging in conduct prejudicial to the administration of justice and that adversely reflects on fitness to practice law), 6-101(A)(3) (neglecting an entrusted legal matter), 7-101(A)(1) (failing to seek client's lawful objective), and 7-101(A)(2) (failing to carry out contract for professional services). A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") heard the matter on July 29, 1994.

{¶ 2} Respondent stipulated to the facts and misconduct alleged in Counts One through Six, and relator dismissed Count Seven. The panel, however, determined that respondent had committed misconduct only in connection with Counts Three through Six, which alleged the violations of DR 1-102(A)(5) and (6), 6-101(A)(3), and 7-101(A)(1) and (2). The panel found that these violations

occurred in the course of respondent's representation of Kathleen Crooks, Valerie Burks, and Carol Sue Carmon.

{¶ 3} Kathleen Crooks retained respondent in September 1987 to terminate her ex-husband's visitation rights because she suspected he was sexually abusing their son. Crooks had apparently already refused her ex-husband visitation, and on May 22, 1987, he had filed a motion to show cause and to enforce these rights. The matter was set for hearing on January 25, 1988, but Crooks and her ex-husband settled their differences and agreed to a reduction of the visitation previously ordered before the hearing date. Thereafter, respondent represented to Crooks that he had filed a motion, apparently to change the existing visitation order to reflect the parties' agreement; however, no such motion appears in the domestic relations court's records. Respondent also represented to his client that he had been instructed by the guardian *ad litem*, in effect, not to pursue the motion until spring, although the guardian *ad litem* did not recall this instruction.

{¶ 4} From February 2, 1988 through November 1988, respondent did not return Crooks's telephone calls and did not take any action in her case. When asked about this lack of activity, respondent represented, apparently to relator's investigator, that his client never called him and that he was waiting for a psychologist, working in tandem with the local children's services board, to have the case moved to the juvenile court. The psychologist denied that he agreed to do this, and the ex-husband's attorney did not know of such an arrangement.

{¶ 5} Crooks finally reported her concerns that her ex-husband was sexually abusing their son to Fulton County Assistant Prosecutor Gary Poorman, who referred the matter to the children's services board. The Juvenile Division of the Fulton County Court of Common Pleas subsequently scheduled a hearing on visitation for November 1, 1988, and Crooks advised respondent of the hearing date. Thereafter, the parties apparently resolved their differences again before an adjudication hearing could be held on January 18, 1989.

**{¶ 6}** Sometime after January 18, 1989, Crooks asked respondent to obtain an increase in her child-support payments. On March 16, 1989, the attorney for Crooks's ex-husband wrote to respondent, apparently to advise that the ex-husband had agreed to some proposed terms about increasing child-support payments. For some reason, however, respondent told Crooks that her ex-husband would not agree to the proposed terms, which her ex-husband later told her was not true. In early June 1989, a counselor for Crooks and her ex-husband wrote to respondent and also confirmed the agreement to increase child support. Respondent represented to Crooks that he received this information in July, and he promised to draft papers documenting the agreement. He later represented that he believed the ex-husband's attorney was drafting the necessary papers. By October 1989, respondent still had not prepared these papers, and Crooks discharged him. Her new attorney obtained the increased child-support payments within one month after being retained.

**{¶ 7}** Valerie Burks engaged respondent in early February 1990 to represent her in a divorce and custody dispute, for which the final hearing had been scheduled for February 20, 1990. The parties agreed at the hearing to continue in a joint-custody arrangement. Sometime after the mandatory sixty-day waiting period that followed, Burks asked respondent to take "some action" because she was no longer satisfied with joint custody. Thereafter, respondent advised his client that he had prepared a particular motion and that a hearing had been set for June 1990. On June 1, 1990, Burks contacted the court clerk and learned that no such motion had been filed.

**{¶ 8}** When Burks asked respondent about the missing motion, he promised to send her a copy of a journal entry and represented that he was also preparing a motion to change custody and visitation. On June 22, 1990, Burks telephoned respondent, and he pretended to read the relevant journal entry to her and advised that he was still working on the motion to change custody and visitation. On July 2, 1990, respondent explained to Burks that a judge was causing his delay. On July

20, 1990, respondent promised again to forward copies of the journal entry and motion. In the meantime, the court threatened to dismiss the cause if the parties did not submit the necessary journal entry. On July 25, 1990, Burks contacted the court clerk's office to learn that a motion had been filed to compel respondent's filing of the journal entry. On July 25, 26, and 27, Burks tried unsuccessfully to reach respondent to discuss these developments, and she finally just picked up her case file.

{¶ 9} Sometime in 1989, Carol Sue Carmon paid respondent a $500 retainer and $100 filing fee to represent her in a Wood County vistation proceeding. Respondent told Carmon that he filed a motion to establish visitation on December 13, 1989; however, the court has no record of that filing. Respondent did send a copy of his motion to Carmon, but it took her three months to reach him with her corrections. Finally, in February 1990, respondent advised Carmon that the motion had not been filed because the court had no record of the paid filing fee. He offered to find the canceled check and to contact her when a hearing had been scheduled. Carmon never heard from respondent again, despite her further efforts to contact him. Respondent subsequently represented, apparently to relator's investigator, that his visitation motion had been filed but not heard because of a crowded court docket.

{¶ 10} In recommending a sanction for respondent's violations of DR 1-102(A)(5) and (6), 6-101(A)(3), and 7-101(A)(1) and (2), the panel considered the personal tragedies respondent had experienced during the events at issue. His elderly parents both suffered serious illnesses and required much of his time and care. After several hospitalizations, his mother passed away, and so did his father-in-law. Respondent, himself, suffered from a recurring and incapacitating eye infection caused by a diseased cornea.

{¶ 11} In addition, the panel considered respondent's efforts to regain control over his overwhelming caseload. He attended a time-management course

4

and has used the lessons to responsibly reduce his practice. He also arranged to share office space with an informal mentor, Jude T. Aubry, who now monitors respondent's progress and suggests additional ways to improve his efficiency.

{¶ 12} The panel also considered numerous favorable reports from respondent's professional acquaintances and friends, most of whom attested by affidavit to his competence, integrity, *pro bono* work, and dedication to the practice of law.

{¶ 13} The panel recommended that respondent be suspended from the practice of law for one year, but that this sanction be suspended in favor of a one-year probation period to be formally monitored by Aubry. The board adopted the panel's findings of misconduct and its recommendation.

———————————

*Cooper, Straub, Walinski & Cramer* and *Keith Mitchell*, for relator.
*Lorin J. Zaner*, for respondent.

———————————

***Per Curiam.***

{¶ 14} We have reviewed the record and concur in the board's findings of misconduct and its recommendation. Respondent is therefore suspended from the practice of law in Ohio for a period of one year, but this sanction is suspended on the condition that he successfully completes a year of probation to be monitored by Jude T. Aubry. Costs taxed to respondent.

*Judgment accordingly.*

DOUGLAS, RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., WRIGHT and COOK, JJ., dissent.

———————————

**MOYER, C.J., dissenting.**

{¶ 15} For the same reasons that I dissented in *Toledo Bar Assn. v. Dzienny* (1995), 72 Ohio St.2d 173, 177-178, 648 N.E.2d 499, 502, I am again unable to agree with the majority's disposition of this matter.

{¶ 16} At a minimum, the majority's statement of facts, admitted by respondent, includes no fewer than ten lies told by respondent. Respondent not only lied to his clients but to grievance committee investigators as well. Particularly troubling is respondent's use of court officials and even a judge as scapegoats when confronted by clients for the truth.

{¶ 17} If we truly desire to maintain trust in our profession and in our legal system, this court cannot continue to order sanctions for lawyer misconduct that amount to little more than a slap on the wrist when that conduct involves a continuing breach of trust.

{¶ 18} I am not unmindful of respondent's mitigation evidence nor am I abandoning the hope of rehabilitation. However, as I have previously stated, a "message should be sent to those who question why lawyers who lie to clients are permitted to continue practicing law without interruption, and to lawyers who apparently are assuming that the benefit for deceiving clients is worth the risk of our sanction." *Dzienny, supra*, at 178, 648 N.E.2d at 503 (Moyer, C.J., dissenting). We must communicate with stern conviction that the failure to accept responsibility for one's mistakes and to respond in a forthright and expedient manner will result in actual suspension from the practice of law.

{¶ 19} For the foregoing reasons I would suspend respondent from the practice of law for one year with six months suspended.

WRIGHT and COOK, JJ., concur in the foregoing dissenting opinion.

————————————